FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

MAR 15 23

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF GEORGIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **SEALED** |
| *ex rel.* | ) | |
| H REMIDEZ, LLC | ) | |
| | ) | **Filed *In Camera* and Under Seal** |
| Plaintiffs, | ) | |
| | ) | **1:23-CV-1116** |
| v. | ) | |
| | ) | **Do Not Place on PACER** |
| DELTA AIR LINES, INC. | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

---

*QUI TAM* **COMPLAINT**

---

1.     This is an action to recover damages and civil penalties on behalf of

the United States arising from false and fraudulent statements, records and

claims made by Defendant Delta Air Lines, Inc. The allegations involve

statements made to the U.S. Treasury that falsely certified compliance with the

provisions of the Payroll Support Program (PSP), a program authorized by

Congress to provide financial support to the nation's airlines during the

COVID-19 pandemic. Delta knew its certifications to the Treasury were false

and did not comply with the PSP as detailed herein.

2.     The Coronavirus Aid, Relief and Economic Security Act ("CARES

Act"), the Consolidated Appropriations Act of 2021 ("CAA") and the

1

American Rescue Plan Act of 2021 ("ARPA") authorized the Treasury

Department to provide payroll support to passenger air carriers, cargo air

carriers and certain related contractors in the form and on the terms and

conditions the Department determined appropriate. The $63 billion program

offered financial support to the industry in three separate phases.

3.     To ensure recipients used the tax money to keep employees working,

Congress prohibited recipients from repurchasing their own stock or paying

dividends to shareholders, and limited compensation to executives making $3

million or more a year.

4.     Treasury required each airline to sign an agreement detailing the terms

and conditions that must be followed. For example, the agreement describing

the conditions in the program's first phase said at item 5:

> Dividends and Buybacks
>
> 5.  Through September 30, 2021, neither the Recipient nor any Affiliate shall, in any transaction,
>     purchase an equity security of the Recipient or of any direct or indirect parent company of
>     the Recipient that, in either case, is listed on a national securities exchange.

The terms and conditions continued at item 8:

> 8.  Beginning March 24, 2020, and ending March 24, 2022, the Recipient and its Affiliates shall
>     not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation
>     exceeded $3,000,000 in calendar year 2019 Total Compensation in excess of the sum of:
>
>     a.  $3,000,000; and
>
>     b.  50 percent of the excess over $3,000,000 of the Total Compensation received by such
>         Corporate Officer or Employee in calendar year 2019.

2

5.  The agreement signed by Delta said the airline:

> ... agrees to comply with this agreement and applicable Federal law as a condition of receiving Payroll Support. The Signatory Entity and its undersigned authorized representatives acknowledge that a materially false, fictitious or fraudulent statement (or concealment or omission of a material fact) in connection with this Agreement may result in administrative remedies as well as civil and/or criminal penalties.

6.  The restrictions described in the letter of agreement with Treasury mirror the prohibitions enacted by Congress in Division A, Title IV of the CARES Act, Subtitle A of Title IV of Division N of the Consolidated Appropriations Act of 2021 and Section 7301 of the American Rescue Act of 2021. Each program phase extended the time period covered by the prohibition and required a new agreement. Each agreement with Treasury required Delta to certify compliance and reiterated the prohibitions and restrictions.

7.  As explained in greater detail herein, Defendant Delta did not comply with these terms and conditions, which purposefully led to the submission of claims in violation of the Federal False Claims Act ("FCA"). 31 U.S.C. Section 3729 *et seq.* Delta certified it complied when it did not. Its misrepresentations to Treasury allowed one of the country's largest airlines to receive $8.5 billion – more than 15 percent of all of the PSP financial aid provided to air carriers by Treasury – to enable it to keep paying its employees. Treasury provided another $3.5 billion in loans subsidized by taxpayers.

8.      The FCA provides that any person who knowingly submits or causes

to be submitted to the Government a false or fraudulent claim for payment or

approval is liable for a civil penalty of $10,781 to $21,563 for each such claim

submitted after November 2, 2015, as well as three times the amount of the

damages sustained by the Government. The FCA permits persons having

information regarding a false or fraudulent claim against the Government to

bring an action on behalf of the Government and to share in any recovery. The

complaint must be filed under seal, without service on the defendants. The

complaint remains under seal while the Government conducts an investigation

of the complaint's allegations and determines whether to join the action.

## PARTIES

9.      **Relator H Remidez, LLC** is a Texas limited liability company. Dr.

Herbert Remidez, Jr. is the president, secretary and treasurer of the company.

Dr. Remidez holds a Ph.D. in Information Science and Learning Technologies

from the University of Missouri at Columbia. He has been employed as a

faculty member in the Satish and Yasmin Gupta College of Business at the

University of Dallas since 2010, where he currently serves as a tenured

Associate Professor. From 2014 through the present, Dr. Remidez has taught

business analytics courses with a focus on cloud computing, big data analytics,

4

predictive modeling, advanced business analytics and artificial intelligence in the University's Master of Science in Business Analytics degree program. Dr. Remidez used data analytics to identify the fraud specified here.

10.     **Defendant Delta Air Lines, Inc.,** a Delaware corporation with principal offices in Atlanta, is the world's largest airline by total revenue. In 2019, prior to the onset of the COVID-19 pandemic, it served approximately 200 million customers. The company asserts in filings with the U.S. Securities and Exchange Commission (SEC) that it is one of the country's most profitable passenger airlines. It recorded five consecutive years of $5 billion or more in pre-tax income between 2015 and 2019. It employs the equivalent of 83,000 full-time workers, 81,000 of whom work in the United States.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, resides in and/or has transacted business in the Northern District of Georgia.

13.     Relator knows of no other FCA complaints that have been filed against the Defendant alleging the same or similar actions for the time period at

issue. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B).

## REGULATORY OVERVIEW

### The Federal False Claims Act

14.     The Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*
reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

- (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

- (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- (C)     conspires to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B); and

- (D)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or

6

knowingly and improperly avoids or decreases an obligation to pay

or transmit money or property to the Government.

15.    31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. §(a)(1)(C); 31 U.S.C. §(a)(1)(G)

16.    The FCA defines "knowing" and "knowingly" to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

17.    In addition to treble damages, the FCA provides for civil penalties for each violation.

**The CARES Act and the Payroll Support Program**

18.    The CARES Act was enacted for the purpose of providing fast and direct economic assistance for American workers, families, small businesses and industries. It was passed by Congress on March 25, 2020 and signed into law on March 27, 2020. At $1.9 trillion, it is one of the largest rescue packages in U.S. history. In late 2020 and early 2021, the Consolidated Appropriations Act and the American Rescue Plan Act together offered

another $2.8 trillion in pandemic relief to businesses and individuals hard hit by the pandemic.

19.      Congress first established the Payroll Support Program to provide financial support to passenger airlines, cargo air carriers and certain industry-related contractors in the CARES Act, 15 U.S.C. §9074 and §9076. It required that these grants from taxpayers be used exclusively for the continuation of employee wages, salaries and benefits. The Act authorized Treasury to provide "payroll support in such form, and on such terms and conditions, as determined appropriate." Congress extended the program in the Consolidated Appropriation Act of 2020, 15 U.S.C. §9094 and §9096, and the American Rescue Plan Act of 2021, 15 U.S.C. §9141.

20.      The three laws and the regulations developed by Treasury each imposed restrictions on recipients of the financial bailout offered through the Payroll Support Program. They specifically state recipients must not repurchase their own publicly traded stock, including shares of any affiliates; must restrict compensation to employees making $425,000 or more a year, provided the pay package was not determined through a collective bargaining agreement; and must limit pay to employees making $3 million or more in

2019. For these employees, the total compensation could not exceed 50 percent of the "excess over $3,000,000."

21.     Between April 2020 and April 2021, the program allocated $54 billion in grants to passenger airlines through three separate programs. In the first phase, Treasury based individual payments to carriers and contractors on payroll expenses incurred between April 2019 and September 2019, subject to proration. The program's second phase, PSP2, awarded the amount approved under the first phase of the program. The third phase, PSP3, used a formula to calculate grants.

22.     Delta received $8.5 billion through these programs.

23.     To obtain financial aid, Treasury required passenger airlines, cargo carriers and certain other covered entities to complete a letter of agreement in which an authorized representative pledged to comply with the terms and conditions of the agreement as well as applicable Federal law.

24.     The agreement with Treasury and subsequent guidelines published by the Department reiterate and elaborate on each prohibition. A breach of any of these provisions allows Treasury to demand repayment with interest, or initiate suspension or debarment proceedings or take any action as Treasury deems appropriate.

9

25.        Terms and conditions in the letter of agreement contained these

restrictions:

### Payroll Support Program 1

Dividends and Buybacks

Through September 30, 2021, neither the Recipient nor any Affiliate
shall, in any transaction, purchase an equity security of the Recipient
or of any direct or indirect parent company of the Recipient that, in
either case, is listed on a national securities exchange.

### Payroll Support Program 2

Dividends and Buybacks

Through March 31, 2022, neither the Recipient nor any Affiliate shall,
in any transaction, purchase an equity security of the Recipient or of
any direct or indirect parent company of the Recipient that, in either
case, is listed on a national securities exchange.

### Payroll Support Program 3
Dividends and Buybacks

Through September 30, 2022, neither the Recipient nor any Affiliate
shall, in any transaction, purchase an equity security of the Recipient or
of any direct or indirect parent company of the Recipient that, in either
case, is listed on a national securities exchange

26.        The PSP agreement also required passenger airlines to restrict

the pay for employees whose total compensation exceeded $3 million in

calendar year 2019 by half of the excess over $3 million. For example, an

executive with a compensation package of $6 million in 2019 only would be

allowed to receive $4.5 million in 2020 – $3 million plus half of the excess of

$3 million received in 2019.

27.        The letter of agreement from Treasury explained:

> The Signatory Entity … agrees to comply with this agreement and
> applicable Federal law as a condition of receiving Payroll Support. The
> Signatory Entity and its undersigned authorized representatives
> acknowledge that a materially false, fictitious or fraudulent statement
> (or concealment or omission of a material fact) in connection with the
> Agreement may result in administrative remedies as well as civil and/or
> criminal penalties.

28.        At signature, recipients were required to certify that they may

be subject to penalties, administrative remedies or false claims if their

application contained materially false, fictitious or fraudulent statements.

> I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or
> omission of a material fact) in this certification, or in the application that it supports, may
> be the subject of criminal prosecution and also may subject me and the Recipient to civil
> penalties and/or administrative remedies for false claims or otherwise.

| Corporate Officer of Signatory Entity | Second Authorized Representative |
| --- | --- |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

29.        After acceptance, Treasury required Delta to file quarterly

"compliance reports." The reports contain mandatory sections detailing

employee headcount, compensation information, the number of high-income

employees and corporate officers subject to financial restrictions, supporting

documentation and certifications. The supporting documentation included

financial statements and IRS Form 941 -- the employer's quarterly federal tax

return.

30.        In the certification section, Treasury mandated:

> … recipients certify their ongoing compliance with the terms and
> conditions of the PSP agreement, maintenance of internal controls
> related to compliance with the PSP Agreement, and the veracity and
> accuracy of any data, documents or information provided to Treasury.

31.        Treasury warned participants that failure to provide timely and

accurate information may result in the Department finding the recipient in

violation of the PSP agreement. Under the agreement, Treasury alone has the

authority to withhold additional support, terminate the arrangement and require

repayment, if it concludes a participant was non-compliant. For example:

> If Treasury makes a final determination … that an instance of
> noncompliance has occurred, Treasury may, in its sole discretion,
> withhold any Additional Payroll Support Payments; require repayment
> of the amount of any previously disbursed Payroll Support, with
> appropriate interest; require additional reporting or monitoring; initiate
> suspension or debarment proceedings as authorized under 2 CFR Part
> 180; terminate the Agreement; or take any such other action as
> Treasury, in its sole discretion, deems appropriate.

## ALLEGATIONS

### Background and Relator's Methodology

32.        In 2020, Dr. Remidez, the principal of the Relator, used his
knowledge of advanced analytics in conjunction with various software
packages that rely on artificial intelligence to review electronic information
maintained by the Small Business Administration ("SBA") detailing PPP loans
made to individuals, sole proprietorships and companies across the country.

33.        Using cloud-based software, Dr. Remidez assembled a PPP-
loan database of 67 separate and related tables ranging in size from 2,840 to
8.8 million rows. Database tables organize information into rows and columns,
much like an Excel spreadsheet, making it easier to store and compare. His
analysis began by converting each of the PPP program regulations and
guidance into software rules that could be used to help examine the hundreds
of billions of dollars in taxpayer-backed loans.

34.        After structuring and organizing the SBA data, Dr. Remidez
augmented his PPP-loan database with information from 26 separate sources
including non-profit tax information maintained by the Internal Revenue
Service, data from the U.S. Treasury, the Department of Labor, the Federal
Deposit Insurance Corporation and legislative lobbying records maintained by

Congress as well as datasets detailing individuals and companies debarred or excluded from federal contracting, businesses registered under the Foreign Agents Registration Act, investment firms supervised by the Securities and Exchange Commission and firms that are traded on national stock exchanges.

35.      These datasets use different naming conventions and identifiers, making an electronic comparison impossible. Resolving these differences to allow an accurate comparison required exploratory analysis, data preparation and the development of customized computer code, commonly called recipes, to identify and resolve inconsistencies and anomalies. In this case, the data "cleaning" process used customized software recipes with as many as 59 steps. This cleaning process was applied to each of these varied datasets. Many of the database inquiries used to standardize the information required hours to complete.

36.      Dr. Remidez then employed an entity resolution software program powered by artificial intelligence (AI). Entity resolution software determines whether records from diverse sources match. Record matching programs can match names with slight misspellings, accent marks and abbreviation. They cannot recognize relationships within the data or update results to incorporate newly added information. AI-driven programs perform the

14

rudimentary matching while incorporating additional techniques to recognize what the underlying data strings represent.

37.      The AI software used by Dr. Remidez recognizes common nicknames, common misspellings and variations on the same address. For example, the AI learning model equates Jim with James, Bill with William and Mohammed with Mohammad. It also recognizes address variations and matches them, such as 1 First St. and One 1St. Street. When new information is added, the AI-driven software dynamically updates. In simple terms, it "learns" with every update.

38.      An analysis of PPP loan data for November 2021 in Arizona illustrates the operation of the AI-driven software. An analysis using Microsoft Excel found 209 duplicate borrowers among 128,807 loans. After cleaning the data, it identified 253. Using only the PPP loan data maintained by SBA, the AI-driven software labeled 865 as duplicates, four as possible duplicates and 24,000 as possibly related.

39.      In this example, after adding eight additional data sets – comprising medical practices and business addresses, Economic Injury Disaster Loans, resident visa applications, Shuttered Venue and Restaurant

Revitalization loans – the duplicates increased by 63 and the possibly related category fell by 2,600.

40.          While these results are impressive, all AI systems are fallible. To mitigate errors, Dr. Remidez compared the results against additional records, such as state business registries, and employed other filters and software to verify the outcome. Dr. Remidez manually checked the results.

41.          With the help of these advanced software packages and custom programming code developed for this project, Dr. Remidez compared borrower names, addresses and project locations and applied the software rules he developed to identify violations of the regulations governing the PPP loan program.

42.          The extensive fraud uncovered in the PPP program through the use of advanced software tools and custom programming prompted Dr. Remidez to expand his examination to other government financial aid programs. Insights gained from the fraud uncovered in the loan program led him to focus on programs with eligibility and compliance requirements that are difficult to monitor.

43.          PPP fraud clustered around program requirements that are difficult to track, reducing the likelihood that wrongdoing would be identified

16

and perpetrators would be caught. Academic research repeatedly has concluded the perceived likelihood of getting caught is a major deterrent. Dr. Remidez reviewed the terms and conditions of other federal financial aid programs, targeting those with difficult to monitor eligibility or compliance requirements.

44.     The terms and conditions of the PSP program required retention of employees, restricted executive compensation and prohibited dividend distributions and stock buybacks. Reports required by the Department of Treasury clearly identified the number of employees, but made it difficult to track executive compensation and stock purchases.

45.     Dr. Remidez expanded his databases with information from the Treasury department detailing aid to passenger airlines, cargo carriers and certain contractors to the airline industry. Treasury records listed the recipients and the amount of federal grants and loans, but provided little insight into related corporations, the number of employees, executive pay or stock purchases.

46.     Data from the Department of Transportation, the Securities and Exchange Commission (SEC) and USAspending.gov, which maintains spending records on other pandemic aid programs, augmented his databases.

17

DOT records, for example, track the number of airline employees on a monthly basis.

47.  USAspending.gov provided names, addresses, amounts received and parent company information. Once incorporated, the AI software detected relationships in the PSP program and participants in the PPP loan program. The program detected declared and undeclared relationships between companies.

48.  After identifying the relationships, Dr. Remidez developed a custom software program to extract information from the Electronic Data Gathering, Analysis and Retrieval system (EDGAR) database maintained by the SEC.

49.  The Buyback Detection Program he developed extracts the information needed to determine the number of outstanding shares using the earnings per share and net revenue from annual and quarterly company filings in the EDGAR system.  Dr. Remidez instructed the program to gather financial information from each PSP recipient.

50.  For Delta, the compiled data showed decreases in the number of outstanding shares, a practice that violated PSP program requirements. Dr.

Remidez then verified the findings of his electronic investigation by examining the individual quarterly and annual filings made by Delta.

51.       Upon    verification,    Dr.    Remidez    reviewed    executive compensation. His review found that Delta paid its executives more than allowed under the program requirements enacted by Congress

52.       The expanded data warehouse constructed by Dr. Remidez allowed him to apply the program rules governing the PSP program, identify recipients and compare the results to information filed by Delta with the SEC.

53.       Relator is the original source of the allegations and the proprietary analysis, methodology and data synthesis detailed herein.

## Specifics of the Fraud

54.       Congress enacted the Payroll Support Program to avert mass layoffs and furloughs caused by an unprecedented drop in airline travel. In April 2020, the number of passengers on U.S. airlines was 96 percent lower than a year earlier. Six months later, in October 2020, air travel remained 65 percent below pre-pandemic levels. The first phase of the PSP program disbursed $28 billion to 610 recipients, including 352 passenger airlines, 38 cargo carriers and 220 contractors.

55.     To obtain taxpayer-funded grants and loans, Delta signed a letter of agreement with the Department of the Treasury that specifically required the company to certify that it would:

a.  Use the proceeds from the Payroll Support Program exclusively for the continuation of the payment of wages, salaries and benefits to Delta's employees. Delta agreed not to conduct the involuntary termination or furlough of any employee;

b.  Not purchase its own publicly traded stock, including shares of affiliates;

c.  Restrict compensation to employees making $425,000 or more a year, provided the pay package wasn't determined through a collective bargaining agreement;

d.  Limit pay to employees making $3 million or more in 2019. For these employees, the total compensation in the relevant time periods could not exceed $3 million plus half of the excess over $3 million.

56.     Federal law, letters of agreement and guidelines issued by Treasury unequivocally and absolutely prohibit recipients from purchasing stock of the applicant or its direct indirect parent company. 15 U.S.C §9704, for example, states:

20

> To be eligible for financial assistance under this part, an air carrier or contractor shall enter into an agreement with the Secretary, or otherwise certify in such form and manner as the Secretary shall prescribe, that the air carrier or contractor shall -- …
>
> (2) Through September 30, 2021, ensure that neither the air carrier or contractor nor any affiliate of the air carrier or contractor may, in any transaction, purchase an equity security of the air carrier or contractor or the parent company of the air carrier or contractor that is listed on a national securities exchange.

The Consolidated Appropriations Act and the American Rescue Plan both apply and impose the same restriction. The CAA prohibits stock repurchases through March 31, 2022, 15 U.S.C. §9094(a)(2). The ARPA restricts equity repurchase through September 30, 2022, 15 U.S.C. 9141(4)(D)(ii).

57.     Delta memorialized these arrangements in its securities filings. In its 2021 10-K annual report, for example, the airline explained:

> *Payroll Support Program Extension (PSP2)…* Other conditions include prohibitions on share repurchases and dividends through March 2022 and certain limitations on executive compensation until October 2022.
>
> … *Payroll Support Program 3 (PSP3)* … Other conditions include prohibitions on share repurchases and dividends through September 30, 2022 and certain limitations on executive compensation until April 1, 2023.

58.     Delta told investors that it agreed to extend the prohibition against stock repurchase through September 30, 2022 so that it could take

21

advantage of the final phase of the program, which brought the company \$3.1 billion.

59.          The company expanded on the terms and conditions of the financial aid program in other securities filings. It explained in its 2020 10-K filing:

> *Capital Returns to Shareholders.* In early March 2020, we suspended both our share repurchase program and future dividends due to the impact of the pandemic. Prior to suspending these activities, in the March 2020 quarter, we repurchased and retired 6 million shares of our common stock at a cost of \$344 million and paid a quarterly dividend of \$260 million. The CARES Act payroll support program initially restricted share repurchase and the payment of dividends through September 2021, which have been continued under the terms of the payroll support extension.

60.          Contrary to its certifications to Treasury and its disclosures to stockholders, Delta repurchased 6.8 million shares of common stock.

61.          Quarterly and annual financial reports filed with the SEC calculate the earnings per share (EPS) as well as the company's profit or loss. EPS is calculated by net income less preferred stock dividends by the number of outstanding common shares. Delta did not issue dividends after accepting federal financial aid.

22

62.     The number of shares fluctuates with the exercise of stock options and warrants, effectively increasing the stock total. The outstanding shares decrease if the company buys back some of the stock it issued. These stock buybacks increase the market value of existing shares.

63.     An analysis of quarterly and annual security filings shows the company did not follow the stock buy-back prohibition imposed by Treasury and federal law, despite telling investors it complied. From March 31, 2020 through September 30, 2022, the number of outstanding shares declined by 6,793,390 shares.

| Source | Date | Earnings per share | Profit/ (loss) (in millions) | Number of Shares * | Increase/ (Decrease) |
|---|---|---|---|---|---|
| 10-Q | 3/31/2020 | $ (0.84) | $ (534) | 635,714,286 | |
| 10-Q | 6/30/2020 | $ (9.01) | $ (5,717) | 634,517,203 | (1,197,083) |
| 10-Q | 9/30/2020 | $ (8.47) | $ (5,379) | 635,064,935 | 547,732 |
| 10-K | 12/31/2020 | $ (19.49) | $ (12,385) | 635,454,079 | 389,144 |
| 10-Q | 3/31/2021 | $ (1.85) | $ (1,177) | 636,216,216 | 762,137 |
| 10-Q | 6/30/2021 | $ 1.02 | $ 652 | 639,215,686 | 2,999,470 |
| 10-Q | 9/30/2021 | $ 1.90 | $ 1,212 | 637,894,737 | (1,320,949) |
| 10-K | 12/31/2021 | $ 0.44 | $ 280 | 636,363,636 | (1,531,100) |
| 10-Q | 3/31/2022 | $ (1.48) | $ (940) | 635,135,135 | (1,228,501) |
| 10-Q | 6/30/2022 | $ 1.15 | $ 735 | 639,130,435 | 3,995,300 |
| 10-Q | 9/30/2022 | $ 1.09 | $ 695 | 637,614,679 | (1,515,756) |
| **Purchased shares** | | | | | **(6,793,390)** |

*Calculated by dividing the net income or loss by the EPS.

64.    Further, these decreases are not accounted for in the quarterly and annual filings as required under securities regulations. Delta disguised its actions by failing to properly disclose its stock purchases as required under Items 703 of Regulation S-K §229.703. Item 703 requires publicly traded companies to disclose any stock purchases in Form 10-Q for the first three quarters and in Form 10-K for the fourth quarter. More specifically, it requires companies to disclose in tabular format:

- The total number of shares (or units) purchased, regardless of amount and regardless of whether made pursuant to a publicly announced plan or program, by the issuer or any affiliated purchaser during the relevant period reported on a monthly basis and by class, including footnote disclosure regarding the number of shares purchased other than through a publicly announced plan or program and the nature of the transaction;

- The average price paid per share (or unit);

- The total number of shares (or units) purchased as part of a publicly announced repurchase plan or program; and

- The maximum number (or approximate dollar value) or shares (or units) that may yet be purchased under the plan or program.

65.    Contrary to its certifications to Treasury and its reports to investors in filings with the SEC, Delta repurchased some 6.8 million shares of common stock – a practice specifically prohibited by the federal aid programs,

the funding applications signed by airline executives, federal law and guidelines enacted by the Treasury.

66.         The airline paid about $240 million to buy back its stock, based on the closing price of its shares.

### Executive Compensation

67.         Federal law, the letters of agreement and Treasury guidelines also required Delta to limit compensation to executives making more than $425,000 a year. It placed additional limits on corporate officers or employees making $3 million or more. For example, the agreement for the initial payment from the program said:

> 8. … the Recipient and its affiliates shall not pay any of the Recipient's Corporate Officers or Employees whose Total Compensation exceeded $3,000,000 in calendar year 2019 Total compensation in excess of the sum of:
>
> a. $3,000,000; and
> b. 50 percent of the excess over $3,000,000 of the Total Compensation received by such Corporate Officer or Employee in calendar year 2019.
>
> 9. For purposes of determining applicable amounts under paragraphs 7 and 8 with respect to any Corporate Officer or Employee who was employed by the Recipient or an Affiliate for less than all of calendar year 2019, the amount of Total Compensation in calendar year 2019 shall mean such Corporate Officer's or Employee's Total Compensation on an annualized basis.

25

68.        Both the PSP2 and PSP3 agreements include similar provisions.

69.        Treasury rules do not pertain to compensation determined

through a collective bargaining agreement entered into before March 27, 2020.

Delta does not issue employment contracts to its corporate executives. Their

compensation package was not determined as part of a collective bargaining

agreement. A collective bargaining agreement refers to an arrangement between

an employer and a union arrived at through a negotiation process.

70.        Delta reiterated the limitations imposed by law, the letters of

agreement with Treasury, guidelines and regulations on compensation to its

executives in a 2021 proxy provided investors in a filing with the SEC:

> As explained earlier, the Personnel & Compensation Committee
> determined our named executive officers' 2020 compensation in
> February 2020, before the CARES Act compensation limitations went
> into effect. Accordingly, the target award opportunities provided under
> the 2020 LTIP are not eligible for inclusion in the CARES Act
> compensation calculation and are not subject to the Cares Act
> compensation limitations.
>
> Company management has designed processes to ensure compliance
> with the CARES Act compensation limitations. As of the date of this
> proxy statement, the total compensation provided to our named
> executives (and all other employees to which these limitations apply)
> for the 12-month period ending March 23, 2021, is within these
> limitations.

26

71.    The Treasury rules provide no exemption for executive

compensation set before a company agreed to accept federal emergency aid.

The agreement signed by Delta and Treasury states that the limitation on

executive compensation would be based on the total compensation paid in

2019. There is no provision for newly negotiated payment schedules unless the

arrangement was determined through a collective bargaining agreement.

72.    The agreement explicitly states that, "Beginning March 24, 2020,

and ending March 24, 2022, the Recipient and its affiliates shall not pay any of

the Recipients Corporate Officers or Employees whose Total Compensation

Exceeded" $3 million plus half of the amount over $3 million that had been paid

to each corporate officer or employee in calendar year 2019. The CARES Act

delineates the same restriction at 15 U.S.C. §9076. The CAA and ARPA extend

the program deadlines while imposing the same restrictions at 15 U.S.C. §9096

and 15 U.S.C. §9141.

73.    In 2019, for example, Edward H Bastian, the chief executive

officer, recorded compensation of $17,325,379. In 2020, his compensation

package was $13,134,012 -- $2,971,323 more than allowed by the formula put

in place by Treasury. This table shows compensation that exceeded the amount

allowed by Treasury for Delta's CEO, President and an executive vice

president:

| Executive | 2019 Compensation | Overage (compensation greater than $3 million) | Half the overage | Half the overage plus $3 million | Maximum Executive Compensation | Actual Compensation | Overpayment |
|---|---|---|---|---|---|---|---|
| CEO Edward Bastian | $17,325,379 | $14,325,379 | $7,162,690 | $10,162,690 | $10,162,690 | $13,134,012 | $2,971,323 |
| President Glen W. Hau | $9,967,833 | $6,967,833 | $3,483,917 | $6,483,917 | $6,483,917 | $7,455,109 | $971,193 |
| Exec VP Peter Carter | $5,037,459 | $2,037,459 | $1,018,730 | $4,018,730 | $4,018,730 | $3,618,090 | 0 |
| SubTotal 2020 | | | | | | | $3,942,515 |
| Executive | 2019 Compensation | Overage (compensation greater than $3 million) | Half the overage | Half the overage plus $3 million | Maximum Executive Compensation | Actual Compensation | Overpayment |
| CEO Edward Bastian | $17,325,379 | $14,325,379 | $7,162,690 | $10,162,690 | $10,162,690 | $12,360,420 | $2,197,731 |
| President Glen W. Hau | $9,967,833 | $6,967,833 | $3,483,917 | $6,483,917 | $6,483,917 | $7,059,850 | $575,934 |
| Exec VP Peter Carter | $5,037,459 | $2,037,459 | $1,018,730 | $4,018,730 | $4,018,730 | $5,219,037 | $1,200,308 |
| SubTotal 2021 | | | | | | | $3,973,972 |
| Total 2020, 2021 | | | | | | | |

74.         Treasury required quarterly reports from Delta certifying that the

company remained in compliance with the terms and conditions of each PSP

agreement. The report must include information regarding the expenditure of

payroll support funds, the recipient's financial statements and information

regarding employee headcount and compensation.

75.         In April 2020, Treasury told recipients they could satisfy the

financial statement reporting requirement by linking to relevant filings with the

SEC. In an April 29, 2022 proxy statement, Delta describes the restrictions on

compensation. It told its shareholders:

> Delta has designed compliance processes for the CARES Act
> compensation limitations, including, in certain cases, making
> adjustments to the composition of an individual's long-term incentive
> awards, and has provided comprehensive reports to the Treasury
> Department, as required by the PSP agreements.

76.         Reports filed by Delta with the SEC do not reflect payment

arrangements for the company's top executives that comply with the regulations.

77.     Delta caused the U.S. Treasury to provide \$8.5 billion in financial aid through the PSP programs for which it did not qualify in violation of federal law and regulations. The airline is liable for damages and penalties to the United States.

78.     Delta repeatedly electronically transmitted these false claims and certifications to Treasury in letters of agreement and the required quarterly compliance reports. Transmittal of these false claims constitutes wire fraud.

79.     Treasury also required recipients to electronically submit financial and other records filed with the Securities and Exchange Commission. In electronic filings with the SEC and made available to investors, the airline misrepresented its compliance with federal law and regulations governing the emergency lending program in violation of Treasury rules and regulations.

80.     These misrepresentations, which were electronically transmitted, violate Section 10(b) of the Securities and Exchange Act of 1934 which prohibits the use of "any device, scheme or artifice to defraud" and the making of any "untrue statement of material fact" or the omission of any material fact necessary to make reports to the SEC not misleading. The knowing electronic transmittal of these untrue statements – part of the company's artifice to defraud – constitutes wire fraud.

81.     These knowing and fraudulent representations to Treasury – a scheme buoyed by misrepresentations to investors in SEC reports filed with the Department to support its claims to emergency aid from taxpayers -- allowed Delta to obtain, retain and spend $8.5 billion in federal aid that could only be used for the continuation of employee salaries, wages and benefits, provided the recipients adhered to specific restrictions and prohibitions detailed in federal law and regulations.

82.     In its agreement to acquire financial aid, Delta certified that Treasury, in its sole discretion, could require repayment, suspend or debar a recipient from contracting with the federal government, impose penalties or take other appropriate action.

83.     Delta, through the fraudulent schemes it enacted during the pandemic, directed approximately $240 million in federal emergency aid to repurchase outstanding stock and enrich its top executives in violation of federal law and regulations. It is liable to the United States for the $240 million it fraudulently acquired and used as well as interest and penalties.

## COUNT I

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729 et seq.

84.    Relator incorporates paragraphs 1 through 83 of this Complaint as fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

85.    As described in greater detail above, Delta failed to comply with the provisions, restrictions and prohibitions set forth by federal law and regulations governing the Payroll Support Program. The airline fraudulently represented that Delta did not repurchase company stock and that it reduced the compensation of its highest paid employees. These representations constitute false claims under the FCA.

86.    Under the FCA, Defendants have violated:

    i.  31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

    ii.  31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

    iii.  31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the

31

> government, or knowingly and improperly avoiding or
> decreasing an obligation to pay or transmit money or property
> to the government.

87.      Because of the false claims made by Defendants, the United

States has suffered and continues to suffer damages, and is therefore entitled to

a recovery as provided by the FCA of an amount to be determined at trial, plus

a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests

that:

a.  This Court enter an order determining that Defendants violated the FCA
    by making false statements and records to cause false claims to be
    submitted to the United States;

b.  This Court enter an order requiring Defendants to pay the maximum civil
    penalties allowable to be imposed for each false or fraudulent claim
    presented to the United States;

c.  This Court enter an order requiring Defendants to cease and desist from
    violating the FCA;

d. This Court enter an order requiring Defendants to pay all expenses, attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f. Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted this 15th day of March, 2023.

Counsel for Plaintiff/Relator:

**The Wallace Law Firm L.L.C.**

_____

LEE TARTE WALLACE
Georgia Bar No.: 698320

6030 River Chase Cir.
Atlanta, Georgia 30328
(404) 550-4615